BLACK, and others, Plaintiffs-Appellants, v. GENERAL
ELECTRIC COMPANY, Defendant-Respondent.

Court of Appeals

*No. 77–023. Argued February 1, 1979.—Decided March 5, 1979.*
(Also reported in 278 N.W.2d 224.)

For the plaintiffs-appellants, there were briefs and oral argument by *Harley Brown* of *Brown, Black, Riegelman & Kreul* of Racine and *Richard E. Schmidt* of *Kenney, Krembs, Fellows & Wolfe* of Milwaukee.

For the defendant-respondent, there was a brief and oral argument by *George E. Schimmel* of *Arnold, Murray & O'Neill* of Milwaukee.

Before Moser, P.J., Brown, J., and Bode, J.

MOSER, P.J. On February 11, 1973, a fire completely destroyed the summer home of Dexter and Nancy Black located on Brown's Lake. On February 14, 1973, Deputy State Fire Marshall Kermit Krupka (Krupka) met with members of the Burlington Fire Department and conducted an on-site investigation. The investigation indicated that the fire had started from the lower level of the summer home. In this area, the Blacks kept a 19-inch, black and white portable General Electric television set which they had purchased new September 16, 1966. The set had never been serviced or caused any problems prior to the fire. Possible causes of the fire, such as forcible entry, arson, explosion, gas leaks, furnace or malfunction of other utilities were eliminated.

The remains of the television set were found in the area where the fire had begun. The fly-back transformer for the television set was composed of copper wiring and designed to increase the electrical current to high voltage to illuminate the picture tube. It was found that the copper windings in the transformer had melted due to arcing and high heat. Other copper wiring in the set leading to the transformer had not melted.

The Blacks and their insurer, United States Fire Insurance Co., brought separate suits against General Electric for damages to the premises. The suits were consolidated for trial purposes. The trial commenced November 30, 1976.

At trial, appellants called Krupka as a witness. He refused to testify concerning the cause of the fire. The State Fire Marshall filed an affidavit with the trial court invoking the privilege set forth in sec. 165.55(8), Stats., which reads as follows:

(8) All investigations held by or under the direction of the state fire marshal or his subordinates, may, in his discretion, be private, and persons other than those required to be present may be excluded from the place

where such investigation is held, and witnesses may be kept apart from each other, and not allowed to communicate with each other until they have been examined.

The Blacks made an offer of proof that Krupka would testify that the cause of the fire, in his opinion, was a malfunction of the Blacks' General Electric television set. The trial court would not order Krupka to testify.

One of the appellants' witnesses was Ronald Gayhardt who, with his father, owns and operates a television repair shop and who had extensive experience with television malfunctions. The trial court refused to allow Gayhardt to answer questions on whether the General Electric model television set involved was defectively designed or unreasonably dangerous.

The trial court at the end of the trial instructed the jury on strict liability. It refused appellants' request to eliminate the phrase "unreasonably dangerous" from the instructions and special verdict in favor of the word "dangerous."

On December 3, 1977, the jury returned a special verdict in favor of General Electric on liability issues. The Blacks' and United States Fire Insurance Co.'s post-verdict motions were denied and judgment was entered dismissing their complaints on March 24, 1977.

On their appeal from the judgment, the Blacks object to the court's ruling concerning the fire marshall's privilege. United States Fire Insurance Co. argues that the instructions and verdict should not have employed the term "unreasonably dangerous" on the issue of strict liability and that the trial court should have allowed Gayhardt to testify concerning his opinion of defective design.

### FIRE MARSHALL—PRIVILEGE

On February 14, 1973, Assistant Fire Marshall Kermit Krupka investigated the fire with Assistant Fire Chief

Fred Beck and Captain Phillip Rousch of the Burlington Fire Department. Two weeks before the trial, Krupka was subpoenaed to testify. The subpoena did not require him to attend the trial with any documents or reports from the office of the State Fire Marshall. Krupka appeared at trial to honor the subpoena, along with Assistant Attorney General Melvin Washington. Washington filed an affidavit of the State Fire Marshall, Frank A. Meyers, invoking the fire marshall's privilege stated in sec. 165.55(8), Stats. The affidavit of the State Fire Marshall is not made part of this record. Outside the presence of the jury, the appellant and the court questioned Krupka under oath. Krupka stated that because of the State Fire Marshall's affidavit, he would refuse to answer any questions concerning the fire.

The Blacks argued that the privilege exerted by the State Fire Marshall is a limited privilege and that after arson is ruled out, the assistant fire marshall should be required to testify in private suits of this kind about the results of the investigation. They urged that the requirement would be especially appropriate here since no attempt was made to require divulgence of the department's records and reports. Washington argued, as does the respondent here, that the fire marshall's privilege is absolute, and once the privilege is exercised no court can require a fire marshall or any of his subordinates to testify concerning the investigation or produce documents or reports of any fire. The trial court ruled the privilege was absolute and released Krupka from the subpoena.

The record reflects that Mr. Black personally served the subpoena on Krupka two weeks before trial and discussed with Krupka his recollection of the investigation made on the fire in question. When the trial court ruled that the fire marshall's privilege under sec. 165.55(8), Stats., was absolute and that Krupka would not be re-

quired to testify, Black made the following offer of proof:[1]

MR. BLACK: That he would testify that on the morning of February 14, 1973, he came to the Dexter Black residence in the Town of Burlington, and in conjunction with members of the Burlington Fire Department, namely Assistant Chief Fred Beck, and Captain Phil Rousch, and Chief of Police Ken Bose, (Phonetically) examined the remains of the residence and the personal property; that they first examined the furnace room and found the furnace and other appliances there, including the water heater, dryer and washer, to be intact; and that they examined the gas pipes and eliminated any cause of explosion from gas. They examined the circuitry and eliminated that as being any cause of the fire. They examined the contents or exterior of the house with reference to windows and doors and found them to be in a position of being locked, although they had been destroyed, and eliminated the fire as being caused by vandalism. They determined the origin of the fire to be at T, and as indicated on plaintiff's exhibit 6, that they determined that this was the hot spot of the place where the fire began; and that they could trace the fire pattern from the timbers. The fire then consumed the recreation room, proceeding in a westerly direction, then up to the first floor, consuming the rest of the house, then consummating in the lower level again in the garage area, which was separated from the recreation room by several layers of asbestos fire resistant material. They then examined the spot marked T and discovered the flyback transformer, the electrical outlet box, and the other exhibits contained and marked plaintiff's exhibits 14, 13 and 15, and from examination of the fly-back transformer, finding the copper wires to be fused, and distinguishing it from the copper wires in the yoke as being not fused, they determined that the cause of the fire was a malfunction in the T.V. transformer designed and manufactured by the G. E. Company; and their report was then filed with the State Fire Marshal's Office; and that concluded its investigation.

---

[1] Section 901.03(1)(b), Stats., provides a right to make such an offer in order to preserve error in an exclusion of evidence.

Black's opening statement to the jury referred extensively to the testimony he would elicit from the assistant state fire marshall. Since it was only immediately before opening statements that any of the trial participants became aware that Krupka would not testify, the trial court gave the following curative instruction to the jury:

During the trial mention was made of a deputy state fire marshall being at the scene of the fire. He did not testify in this case because, under our law, his investigation is privileged and none of the parties can compel him to testify unless he wishes to do so. Accordingly, you are to draw no inference in this case because of his absence as a witness.

The statute says that "[a]ll investigations held by or under the direction of the state fire marshall, or his subordinates, may, in his discretion, be private, . . . ."[2] "The manifest purpose of the law is to apprehend and punish those who may be guilty of the crime of arson and to discourage the burning of property for the purpose of recovering the insurance thereon."[3] Fire marshall reports concerning the origin of specific fires are privileged;[4] books and memos of the origin of specific fires are also privileged.[5] These documents cannot be used in evidence if the privilege is exercised and cannot be reached for use in evidence by a subpoena duces tecum.[6] Only the State Fire Marshall, not his subordinates or the courts, has the discretion to raise or waive the privilege

---

[2] Sec. 165.55(8), Stats.

[3] *State ex rel. Spencer v. Freedy*, 198 Wis. 388, 391, 223 N.W. 861, 862 (1929), quoted in *Gilbertson v. State*, 205 Wis. 168, 171, 236 N.W. 539, 540 (1931).

[4] *State ex rel. Spencer v. Freedy*, 198 Wis. at 391–92, 223 N.W. at 862.

[5] *Gilbertson v. State*, 205 Wis. at 171–72, 236 N.W. at 540.

[6] *Id.*

concerning reports, books, and memos.[7] The Blacks' contention that the privilege is limited to written materials is without merit. The privilege covers all "investigations," which includes a fire marshall's testimony about the investigation as well as the notes made and physical evidence seized.[8]

Krupka cannot be faulted for his refusal to testify. Once the secrecy privilege is exercised by the State Fire Marshall, courts cannot force deputy fire marshalls to testify concerning investigations of the origins of specific fires since it places such a subordinate in an embarrassing and difficult position and tends to interfere with the proper discharge of his duties toward his superior, the State Fire Marshall.[9] We hold that all investigations by the State Fire Marshall are subject to the privilege, and therefore Krupka, once the State Fire Marshall exercised the privilege, could not be required to testify concerning the investigation of the source of the fire in question.

As we have stated, the statute gives the State Fire Marshall discretion to exercise a privilege, on the grounds of state secrecy, against requiring him or his subordinates to testify or produce reports, books and memos in a civil case. That exercise of privilege is not absolute, however, since he must exhibit to the court that he has exercised discretion. Although a court cannot compel an officer to perform a discretionary act in any particular manner, the one vested with discretionary power must implement the power only with discretion and not as a result of arbitrary conduct.[10]

---

[7] *Id.* at 172–73, 236 N.W. at 540–41.

[8] 40 Op. Att'y Gen. 34, 38–39 (1951).

[9] *Gilbertson v. State*, 205 Wis. at 173, 236 N.W. at 541.

[10] *State ex rel. Hurley v. Schmidley*, 48 Wis.2d 659, 663–64, 180 N.W.2d 605, 607 (1970); *State ex rel. Knudsen v. Board of Educ.*, 43 Wis.2d 58, 67, 168 N.W.2d 295, 299 (1969).

The affidavit of the State Fire Marshall, received in evidence by the trial court, is not part of this record. We do not know its contents since our search of the record only discloses that the State Fire Marshall exercised the privilege of secrecy. The trial court earnestly tried to find the reasons for the exercise of the privilege, but the only statement he obtained from the Assistant Attorney General was that this privilege was absolute. We can only assume that no reasons were given. Reasons must be given to show there was an exercise of the required discretion. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. This process must depend upon facts that are of record or are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards.[11]

Had the affidavit of the State Fire Marshall stated there was an ongoing arson investigation, that affidavit would have exhibited a proper reason for exercising the privilege and maintaining the secrecy of the investigation. Where such a reason is not given, however, there is no basis to conclude that discretion has been properly exercised.[12] Thus, an opinion of the Attorney General advised the State Fire Marshall:

If criminal proceedings have been completed, I see no reason why the privilege should not be waived in most cases. The necessity for secrecy no longer exists and in the interest of doing justice between private litigants the results of the investigation ought to be made available. The claiming of a privilege for "state secrets" after the reason for it had disappeared, or when no rea-

[11] *Reidinger v. Optometry Examining Board*, 81 Wis.2d 292, 297, 260 N.W.2d 270, 273 (1977).
[12] *Id.*

son existed in the first place, results in wholly unnecessary injustice to private litigants.[13]

We note that the trial court is required to ascertain on his own motion, on preliminary inquiry outside the presence of the jury, the scope of the deputy fire marshall's authority to disclose,[14] but that inquiry does not go far enough. In addition to determining how much the fire marshall is willing to disclose, the trial court must also determine whether any refusal to disclose is based on a reasonable exercise of discretion. We hold that once there is an adequate hearing and the trial court determines that the State Fire Marshall has established proper discretionary reasons for exercising the privilege of secrecy, then the court can go no further and the privilege must stand. Without such a showing, however, the privilege cannot be enforced. This view concurs with the long standing principle that privileges and confidentialities granted by statute must be strictly interpreted.[15]

On the record, there is no showing of the requisite exercise of discretion to invoke the privilege. The record reflects that questions were asked, but no showing was made that the State Fire Marshall had properly exercised his discretion. We think the trial court erred in this respect and in so doing may have foreclosed the Blacks from presenting all available evidence in this case.

General Electric contends that the failure of Krupka to testify was harmless because his testimony would have been merely cumulative. Examination of the testimony

---

[13] 40 Op. Att'y Gen., 34, 38 (1951).

[14] *Gilbertson v. State*, 205 Wis. at 174, 236 N.W. at 541.

[15] *Davison v. St. Paul Fire and Marine Insurance Company*, 75 Wis.2d 190, 197, 248 N.W.2d 433, 438 (1977).

presented, however, shows that this testimony would have added significantly to the Blacks' case.

According to Black's offer of proof, Krupka would have testified that the cause of the fire was a malfunction in the transformer. Beck and Rousch, who accompanied Krupka during his inspection of the premises, testified at trial. They eliminated house gas, fuel supply, gas appliances and arson as sources of the fire but could not give an opinion that the fire had started in the television set. Dowie Soetenga, general manager of Wisconsin Southern Gas, living near the scene of the fire, also eliminated the furnace, water heater, freezer and all gas pipes as causes of the fire but was not asked to identify the source of the fire.

Each side produced an expert with a doctorate in electrical engineering who had examined the remains of the television. The Blacks' expert testified that he had determined that arcing inside the transformer was the source of the fire, but General Electric's expert testified that the arcing was the result of the fire and not its cause. No other testimony on the cause of the fire was introduced. Therefore, Krupka's testimony, according to the offer of proof, would have been instrumental to a resolution of the dispute between the experts and would not have been cumulative.

The judgment must be vacated and the cause remanded for a determination of whether the State Fire Marshall properly exercised his discretion in claiming the statutory privilege. If no valid reason for protecting the results of the investigation can be given, Krupka would be subject to subpoena, and a new trial must be held. We address the remaining issues because of this possibility.

## STRICT LIABILITY—UNREASONABLY DANGEROUS

The question presented to the jury concerning the strict liability of General Electric reads as follows:

Question 3. Was the General Electric television set in question, when it left the possession of the defendant, defective in design so as to be unreasonably dangerous to a consumer or user?

The appellants' requested verdict question was similar to the above but eliminated "unreasonably." The trial court, in instructing the jury on this question, employed the pattern jury instruction.[16] The appellants had requested a modified form of the pattern instruction, again leaving out the reference to "unreasonably dangerous," retaining only the word "dangerous."

The appellants based their arguments before the trial court and before this court on decisions of other jurisdictions[17] and a dissent written in the Wisconsin Supreme Court.[18] They assert that these opinions stand for the proposition that the term "unreasonably dangerous" improperly injects negligence principles into strict liability. They clearly reject the Restatement of Torts use of the term, preferring to leave only the word

---

[16] Wis J I—Civil, Part II, 3260.

[17] *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972); *Glass v. Ford Motor*, 123 N.J. Super. 599, 304 A.2d 562 (1973); *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975).

The New Jersey Supreme Court has recently announced that the criterion of "unreasonably dangerous" remains applicable to cases of alleged design defects and disapproved any inconsistent language in *Glass v. Ford Motor Co., supra. Cepeda v. Cumberland Engineering Co.*, 76 N.J. 152, 386 A.2d 816 (1978).

[18] *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 333–36, 230 N.W.2d 794, 799–801 (1975) (Wilkie, C. J., dissenting).

"dangerous" in the strict liability instruction to the jury and the question of strict liability presented to the jury.

Wisconsin adopted the theory of strict liability set forth in sec. 402A of the Restatement of Torts. This adoption requires the plaintiff, in an action for strict liability, to prove: (1) that the product was defective when it left the possession or control of the manufacturer or seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the manufacturer or seller expected to and did reach the user or consumer without substantial change in the condition it was in when it was manufactured or sold.[19]

The Wisconsin Supreme Court has pointed out that its adoption of the theory of strict liability in products cases does not mean absolute liability or that the producer or seller becomes an insurer. Strict liability, in this state at least, means negligence as a matter of law or negligence *per se,* and the adoption of the rule of strict liability based on this negligence in effect relieves the plaintiff of proving a specific action of negligence and requires the defendant to prove he was not negligent in any respect. This allows for the application of comparative negligence.[20]

Wisconsin has also adopted the restatement definition of unreasonably dangerous which says in part: "The

---

[19] *Dippel v. Sciano,* 37 Wis.2d 443, 460, 155 N.W.2d 55, 63 (1967).

[20] *Powers v. Hunt-Wesson Foods, Inc.,* 64 Wis.2d 532, 536, 219 N.W.2d 393, 395 (1974).

article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."[21] The last written word of the supreme court on the issue of "unreasonably dangerous" is as follows: "Irrespective, however, of the interpretation to be given to either the majority or dissent in *Vincer,* the 'unreasonably dangerous' element remains an essential ingredient of an action brought pursuant to *Dippel* and its progeny."[22] In that case, the court said the trial judge correctly interpreted the law when he instructed the jury. We are compelled to say the same here. The trial judge correctly interpreted the law when he so instructed the jury pursuant to Wisconsin pattern jury instructions.[23]

### *LAY EXPERT*

The last issue raised on this appeal is whether the trial court erred in refusing to allow the jury to hear Ronald Gayhardt's opinion concerning the defective design of the General Electric television set in question. On direct examination, Mr. Gayhardt was asked the following question:

Black: Now Mr. Gayhardt, speaking from the standpoint of safety, from the standpoint of fuses as representing a safety device, do you have an opinion as to whether or not the General Electric set which we have described in court, the black and white, 19 inch model number that we have referred to use a single one and a half amp. fuse, was defectively designed?

---

[21] Restatement (Second) of Torts, §402A, Comment *i* (1965). *See Vincer v. Esther Williams All-Aluminum Swimming Pool Co.,* 69 Wis.2d at 331, 230 N.W.2d at 798; *Arbet v. Gussarson,* 66 Wis. 2d 551, 557, 225 N.W.2d 431, 435 (1975).

[22] *Heldt v. Nicholson Mfg. Co.,* 72 Wis.2d 110, 115, 240 N.W.2d 154, 157 (1976).

[23] Wis J I—Civil, Part II, 3260.

General Electric's counsel objected to the question on the basis that there was no foundation that Gayhardt had ever designed anything. The objection was sustained.

In argument on this subject before the trial court, heard away from the jury, Black stated the next question would have been:

My next question would have been whether or not in his opinion—assuming the first question was answered yes, the design was defective from a safety standpoint —whether or not from a safety standpoint the set was unreasonably dangerous to the ultimate purchaser?

Opinion evidence of lay witnesses regarding matters within their field of expertise is generally held to be competent, and the probative force of such testimony is for the trier of the fact.[24] The opinions are valid even though such opinions are not based upon technical or academic knowledge but upon expertise gained from experience.[25] A lay expert is one whose expertise or special competence derives from experience working in the field of endeavor rather than from studies or diplomas.[26] Indeed, experience in some cases may be the most important element of expertise. "Whether an opinion of a witness may be given depends upon his superior knowledge in the area in which the precise question lies."[27]

Gayhardt had about twenty years of experience in the repair of all types of television sets. He had seen a dozen sets fire damaged by electrical circuit malfunctioning. He had attended twenty one-day seminars acquainting

[24] *Perry Creek Cranberry Corp. v. Hopkins Ag. Chem. Co.*, 29 Wis.2d 429, 439, 139 N.W.2d 96, 102 (1966).

[25] *Luke v. Northwestern Nat'l Cas. Co.*, 31 Wis.2d 530, 535, 143 N.W.2d 482, 485 (1966).

[26] *Netzel v. State Sand & Gravel Co.*, 51 Wis.2d 1, 8, 186 N.W. 2d 258, 262 (1971).

[27] *State v. Johnson*, 54 Wis.2d 561, 565, 196 N.W.2d 717, 719 (1972).

him with new products coming on the market. He had taken no training or academic courses in electrical circuit design and had never designed an electrical circuit for a television set. He had never seen the specific General Electric model television set in question in this case nor had he ever worked on one.

The precise question asked of Gayhardt necessitated experience in the design of electrical circuits in television sets. Gayhardt is not a lay expert in design of television sets nor had he ever seen the model in question. While he was competent to testify on matters within his experience, he did not have a sufficient background to answer these two questions. The trial court was correct in disallowing his testimony as a lay expert in response to the question.

*By the Court.*—Judgment vacated and cause remanded for proceedings to determine whether the State Fire Marshall properly exercised his discretion in claiming the statutory privilege and for a new trial on the issue of liability only if that discretion was abused.