Gordon FARRELL, Rachel Farrell, Sara Farrell, James Farrell, by Michael P. Lehner, their guardian ad litem, and Oshkosh Truck Corporation, a Wisconsin corporation, Plaintiffs-Respondents-Cross Appellants,

v.

JOHN DEERE COMPANY, a foreign corporation, and Deere & Company, a foreign corporation, Defendants-Third Party Plaintiffs-Appellants, †

BALLWEG IMPLEMENT COMPANY, Defendant,

NAVISTAR COMPANY, a foreign corporation, Defendant-Cross Respondent,

v.

Gustave MUELLER, M.D., Third Party Defendant.

Court of Appeals

*No. 87-2084. Submitted on briefs September 14, 1988.—Decided May 24, 1989.*

(Also reported in 443 N.W.2d 50.)

†Petition to review denied.

On behalf of the defendants-third party plaintiffs-appellants-cross respondents, the cause was submitted on the briefs of *David J. Cannon & Toni L. Bonney* of *Michael, Best & Friedrich,* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the briefs of *Lynn R. Laufenberg* of *Cannon & Dunphy, S.C.,* of Milwaukee.

On behalf of the defendant-cross respondent, the cause was submitted on the brief of *Frank J. Daily, Patrick W. Schmidt, Mark A. Kircher & Marsha J. Rabiteau* of *Quarles & Brady,* of Milwaukee.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. This is a products liability/ negligence action which was submitted to a jury in two phases in the special verdict. In the first phase, the jury apportioned responsibility among five parties, including the plaintiff, Gordon Farrell, for the damages caused to Farrell when he was seriously injured in a farm accident involving a John Deere corn picker. In the second phase, the jury found John Deere Company and Deere & Company (Deere) 65% responsible and Farrell 35% responsible for Farrell's damages. Deere appeals from the resultant judgment which awarded Farrell total compensatory damages of $966,459.65, plus interest.[1] Farrell cross-appeals as to one of the defendants, Navistar Company (Navistar).

Deere contends that the trial court erred by: (1) submitting Farrell's enhanced injury claim to the jury as a separate basis for Deere's liability, or, in the alternative, failing to compare the negligence of all the parties in the enhancement portion of the verdict; (2) giving erroneous jury instructions; (3) permitting expert testimony regarding the degree of Farrell's enhanced injury; and (4) granting Farrell's post-verdict motion for additur.

Farrell cross-appeals against Navistar. Farrell argues that: (1) the cumulative effect of an erroneous exclusion of evidence, incomplete jury instructions and

---

[1] The judgment also awarded various lesser amounts to Farrell's ex-wife, his minor children and his employer for their derivative claims.

an erroneous special verdict question prejudiced him; (2) the evidence does not support the apportionment of negligence between himself and Navistar; and (3) a new trial as between himself and Navistar is required in the interests of justice.

We are unpersuaded by both Deere's and Farrell's arguments and affirm the judgment.

## FACTS

Farrell was injured while using a Deere corn head and husker, powered by a tractor manufactured by Navistar. Both pieces of equipment were owned by Gustave Mueller, who had purchased them from Ballweg Implement Company (Ballweg). Farrell and the other plaintiffs sued Deere, Ballweg and Navistar. As to Deere and Navistar, Farrell's complaint sounded in products liability and negligence. Deere brought a third-party action against Mueller. Mueller and Ballweg settled with Farrell prior to trial and obtained a *Pierringer* release. *Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

The evidence at trial showed that while Farrell was using the equipment to pick corn, both the corn head and husker suddenly stopped operating. Farrell got off the tractor to check on the picking equipment, leaving the tractor engine running. He does not remember if he shut off the tractor's power take-off (PTO) which powers the picker. The doors that usually cover the husking rolls on the husker had been wired open by Mueller, and when Farrell put his hand into the area of the rolls, the picker suddenly started up again, pulling his hand and arm into the mechanism. Farrell was unable to extricate his arm and eventually his other arm and both legs were also pulled into the rolls. Nearly an hour later, a neigh-

bor found Farrell and stopped the picker by shutting off the PTO on the tractor. Farrell's injuries required amputation of his arms and legs.

Farrell's products liability and negligence claims against Navistar contended that the PTO device on the tractor was defective. Specifically, Farrell contended that the disengaged PTO spontaneously reengaged as Farrell was inspecting the husking rolls.

Farrell's products liability and negligence claims against Deere crystallized into two basic claims: (1) the corn picker was not equipped with an interlock device for the husking box so as to be unreasonably dangerous to the prospective user, thereby causing Farrell's initial entanglement; and (2) the corn picker was not equipped with an emergency stop mechanism near the rolls of the husker, thereby enhancing Farrell's injuries. Because of this "two-tiered" approach, the jury instructions and special verdict divided the accident into two phases: entanglement and enhancement.

As to the entanglement phase, the jury first determined that neither Deere nor Navistar was responsible under products liability law. The jury was then asked to determine whose negligence was responsible for Farrell's entanglement in the husking rolls and to apportion the negligence among the responsible parties. The jury found the following percentages of negligence:

Farrell (contributory negligence) ...................... 70%

Navistar...................................................... 20%

Ballweg...................................................... 5%

Mueller ...................................................... 5%

Deere ........................................................ 0%

Thus, Farrell was determined to be legally responsible for causing his initial entanglement and Deere and

Navistar were exonerated as to this phase of Farrell's claim.

Deere, however, retained exposure in the case because the next portion of the special verdict dealt with the enhancement phase of the accident. This phase concerned only Deere and Farrell. The jury was asked if Deere was responsible under products liability law and in negligence for failing to design and install an emergency shut-off switch on the husker. The jury answered these questions in the affirmative and determined such conduct to be causal of Farrell's enhanced injuries. The jury then apportioned 35% of Farrell's damages and injuries to the entanglement phase and 65% to the enhancement phase.

The jury fixed Farrell's total damages, exclusive of the derivative claims, at $992,000. $200,000 of this award was for "[p]ast and future mental and physical pain, suffering, disability and disfigurement" and $50,000 was for loss of future earnings.

Farrell brought a post-verdict motion for additur to the pain and suffering and future earnings awards. The trial court granted the motion, increasing the pain and suffering award from $200,000 to $750,000 and the future earnings award from $50,000 to $65,000. Deere accepted the additur. Judgment, exclusive of the derivative claims, was entered against Deere for $966,469.65, plus interest, representing 65% of the total damages after additur. (The 65% figure was utilized because the jury had determined that this percentage of the damages and injuries was attributable to Deere's failure to provide the emergency shut-off device.) Deere appeals and Farrell cross-appeals.[2]

---

[2]Farrell also cross-appealed as to Deere, but voluntarily dismissed this portion of the cross-appeal prior to submitting his cross-appeal brief.

In the instant case, Deere is alleged to be responsible both in initiating the accident *and,* by separate conduct, in enhancing the plaintiff's injuries. This situation is unprecedented in reported Wisconsin case law and raises procedural and substantive issues not expressly addressed to date. These include: (1) what jury instructions and special verdict questions should be submitted when a manufacturer is alleged by separate acts to have both caused and enhanced the plaintiff's injuries? (2) can this type of case be presented to the jury in the "two-tiered" manner utilized in this case? and (3) how is the question of comparative negligence presented to the jury in such a case?

We certified this appeal to the supreme court believing these determinations to be beyond the error-correcting and limited law-declaring functions of this court, *see State ex rel. Swan v. Elections Bd.,* 133 Wis. 2d 87, 108, 394 N.W.2d 732, 741 (1986) (Abrahamson, J., *dissenting*); *State v. Grawien,* 123 Wis. 2d 428, 432, 367 N.W.2d 816, 818 (Ct. App. 1985), and more properly within the institutional function of our supreme court, *see State ex rel. Swan,* 133 Wis. 2d at 93–94, 394 N.W.2d at 735. The supreme court, however, declined to accept this appeal on certification.

## APPEAL

### ENHANCED INJURY THEORY

On appeal, Deere argues that the trial court erred by allowing the jury to consider Farrell's enhanced injury claim as a separate issue from the entanglement claim. Deere claims that the enhanced injury theory is inapplicable to this type of products liability case.

Generally, the trial court has wide discretion in deciding what instructions will be given, so long as they "fully and fairly inform[ ] the jury of the rules and principles of law applicable to the particular case." *D.L. v. Huebner*, 110 Wis. 2d 581, 624, 329 N.W.2d 890, 909 (1983). However, whether there were sufficient credible facts to allow the giving of the instruction in the first instance is a question of law to which we apply an independent standard of review which does not require us to defer to the ruling of the trial court. *Walter v. Cessna Aircraft Co.*, 121 Wis. 2d 221, 230–31, 358 N.W.2d 816, 821 (Ct. App. 1984). Thus, the trial court here was required to decide, as a matter of law, whether there were sufficient credible facts to allow the enhanced injury claim to go to the jury. Because this is a question of law for the trial court, so it is with this court. *Id.* at 231, 358 N.W.2d at 821.

Liability based on enhanced injury has been recognized in Wisconsin cases, albeit not in the factual situation we have in this case. These include second collision or crashworthiness cases,[3] seat-belt cases,[4] and successive tort-feasors in medical malpractice cases.[5] In all of these situations, the successive tort-feasor was alleged to

---

[3]*See Sumnicht v. Toyota Motor Sales, U.S.A.*, 121 Wis. 2d 338, 360 N.W.2d 2 (1984); *Johnson v. Heintz*, 73 Wis. 2d 286, 243 N.W.2d 815 (1976); *Arbet v. Gussarson*, 66 Wis. 2d 551, 225 N.W.2d 431 (1975); *Maskrey v. Volkswagenwerk A.G.*, 125 Wis. 2d 145, 370 N.W.2d 815 (Ct. App. 1985).

[4]*See Foley v. City of West Allis*, 113 Wis. 2d 475, 335 N.W.2d 824 (1983); *Austin v. Ford Motor Co.*, 86 Wis. 2d 628, 273 N.W.2d 233 (1979).

[5]*See Voight v. Aetna Casualty & Sur. Co.*, 80 Wis. 2d 376, 259 N.W.2d 85 (1977).

have enhanced or aggravated the plaintiff's injuries, but was not alleged to have caused the initial accident or damage. In these situations, the successive tort-feasor is not jointly liable for all the injuries to the claimant, but only for those injuries caused by the tortious conduct over and above the damage or injury that would have occurred as a result of the accident absent the successor tort-feasor's conduct. *See Sumnicht v. Toyota Motor Sales, U.S.A.,* 121 Wis. 2d 338, 350, 360 N.W.2d 2, 7 (1984).

Deere argues that there was no legal basis for the trial court's application of the enhanced injury theory here because this case did not involve a subsequent impact or a separate tortious event. Instead, Deere argues that the entire event was but one occurrence, legally incapable of dissection into separate tortious events. We disagree.

In second collision/crashworthiness cases, the enhancement theory imposes liability upon a manufacturer for design defects which do not cause the initial accident but which cause additional or more severe injuries when the victim subsequently impacts with the defective interior or exterior of the vehicle. *Id.* at 348–49, 360 N.W.2d at 6. Analogously, Farrell alleged that Deere's failure to install an emergency stop device near the husking rolls, while not causing the initial accident, nonetheless caused additional or more severe injuries. Thus, Farrell's contributory negligence in legally causing the accident (the entanglement) and Deere's separate conduct in failing to design and provide an accessible emergency shut-off device to one already entangled in the machine (the enhancement) constituted distinct factors and events contributing to Farrell's total injuries. It was Deere's design and manufacture of a defective product and its negligence in failing to install an emergency

stop device alone that caused the subsequent and enhanced injuries.

We see no reason in logic or law why application of enhanced injury law should be precluded merely because the successive tort-feasor is alleged also to have tortiously caused the initial accident. Therefore, we conclude that the enhanced injury theory was properly applied to the facts and trial of this case.[6]

## PROCEDURAL DUE PROCESS

Deere next argues denial of procedural due process, asserting that the trial court's application of the enhanced injury theory through the jury instructions and special verdict was a major and unforeseeable departure from the law in this state. As such, Deere claims it was deprived of its right to full and fair notice of the opportunity to defend on this theory. We disagree.

Whether a due process violation has occurred presents a constitutional question. While the trial court's findings of evidentiary or historical fact relevant to such an inquiry will not be overturned unless they are clearly erroneous, the application of constitutional principles to the facts of a case is subject to independent appellate review. *State ex rel. McMillian v. Dickey,* 132 Wis. 2d 266, 280, 392 N.W.2d 453, 458 (Ct. App. 1986).

Minimal procedural due process requires notice of a claim. *State v. Mahone,* 127 Wis. 2d 364, 371, 379 N.W.2d 878, 882 (Ct. App. 1985). However, this constitutional requirement has never precluded novel and crea-

---

[6]This approach was approved in *Tacke v. Vermeer Manufacturing Co.,* 713 P.2d 527 (Mont. 1986).

tive lawyering. Rather, due process assures that, regardless of the claim's familiarity, fair and sufficient notice be given. Thus, we properly look to the procedural history of *this* case (not *others*) to determine whether Deere was fairly forewarned that Farrell's claim embraced both the initial entanglement and subsequent enhancement approach.

Farrell's complaint does not expressly "bifurcate" the accident event. It does, however, allege products liability and negligence claims against Deere as a result of the entire incident. We are to liberally construe pleadings, sustaining them if they give reasonable notice to the responding party as to the nature of the claim. *In re K.N.K.,* 139 Wis. 2d 190, 214, 407 N.W.2d 281, 292 (Ct. App. 1987). With this principle in mind, we deem Farrell's complaint sufficient to embrace both his entanglement and enhancement theories.

More significant to Deere's denial of due process claim was Farrell's pretrial development of his case—particularly in the discovery process. In response to an interrogatory from another defendant, Navistar, Farrell clearly laid out his claim against Deere:

> John Deere's negligence created an unreasonable risk of injury to users of the husker in general and Gordon Farrell in particular. The absence of an adequate interlocking guard *and an acceptable emergency stop mechanism permitting the husking rolls to start turning when Gordon Farrell was in their vicinity and precluded him from stopping them after he was entangled, leading to and enhancing his injuries.* [Emphasis added.]

In addition, the pretrial depositions of certain experts explored Farrell's enhanced injury theory and

63

the effect of Deere's failure to provide an emergency shut-off device. At trial, Farrell continued to pursue his "two-tiered," entanglement/enhancement approach. He presented evidence to show that: (1) Deere was not only negligent and had designed a defective product causing Farrell's initial entanglement, but also that (2) Deere, by separate conduct sounding in both negligence and products liability, had enhanced Farrell's injuries by failing to provide an emergency shut-off device. We see the procedural history of this case as providing Deere with abundant advance notice of Farrell's theory of liability. No procedural due process violation occurred.

## JURY INSTRUCTIONS AND SPECIAL VERDICT

Next, Deere contends that the jury instructions and special verdict erroneously failed to assess the negligence of *all* the defendants and Farrell in the enhanced injury portion of the verdict.

As we have already noted, this products liability/ negligence case presented a unique situation wherein a manufacturer was alleged to have caused both an injury-producing accident and then, by separate conduct, an enhancement of the injuries. The issue is further complicated by the fact that the jury determined that Farrell was legally responsible for his initial entanglement in the machinery. Deere argues that this precludes any recovery, or, at least, requires further inquiry as to Farrell's contributory negligence in the enhancement phase.

██

We have already noted that specific law as to proper jury instructions and verdict structure in this type of case is virtually nonexistent in Wisconsin.[7] We invited

---

[7]In the enhancement cases to date, the manufacturer was only alleged to be negligent in *enhancing* the plaintiff's injuries.

the supreme court to address this void in our certification. With certification denied, we have only *Maskrey v. Volkswagenwerk A.G.*, 125 Wis. 2d 145, 370 N.W.2d 815 (Ct. App. 1985), to assist us. *Maskrey* states that if the instructions and special verdict as a whole adequately convey a logical basis to allocate damages between the parties, there is no error. *Id.* at 154, 370 N.W.2d at 820. Although such a general and imprecise test may be an unsatisfactory state in which to leave the law, we are hesitant to fashion new and significant law in this uncharted area when certification has been denied with *Maskrey* already on the books. Unfortunately, this will require each case to be reviewed on an *ad hoc* basis in order to determine whether the particular instructions and verdict provided a logical basis upon which to assess fault and allocate damages. We thus turn to an application of the *Maskrey* test in this case.

The special verdict first inquired as to the products liability and negligence claims asserted against Deere and the other defendants and the contributory negligence of Farrell as to the entanglement phase. Those inquiries having been answered, the special verdict then directed the jury's attention to the enhancement phase of Farrell's claim. The following questions were asked as to Deere's negligence and products liability exposure.

---

*See, e.g., Sumnicht,* 121 Wis. 2d at 348-49, 360 N.W.2d at 6; *Maskrey,* 125 Wis. 2d at 151, 370 N.W.2d at 818. Although the form of the verdicts was not expressly at issue in any of these cases, the verdicts apparently contained a single set of questions in which all of the parties' negligence was compared. *See, e.g., Sumnicht,* 121 Wis. 2d at 347, 360 N.W.2d at 6; *Maskrey,* 125 Wis. 2d at 151-52, 370 N.W.2d at 818-19. However, in this case Deere carried exposure in both phases in both products liability and negligence.

Was John Deere negligent in failing to take steps in the design of the Model 300 Cornhusker to provide a means to stop the machine in an emergency so as to reduce the extent and severity of injuries in the event of entanglement in the husking rolls? [Answer: Yes]

. . ..

Was the John Deere Model 300 Cornhusker so defective in its design, in that it lacked a means to stop the machine in an emergency so as to reduce the extent and severity of injuries in the event of entanglement in the husking rolls, as to be unreasonably dangerous to users? [Answer: Yes]

. . ..

Was the defective and unreasonably dangerous design of the John Deere Model 300 Cornhusker a cause of any enhanced or increased injury to Gordon Farrell? [Answer: Yes]

. . ..

Assuming Gordon Farrell's total injuries and damages to be 100%, what percentage of those injuries and damages do you find:

(a) to be caused by the entanglement in the husking rolls of the cornhusker? [Answer: 35%]

(b) to be enhanced or increased due to the lack of a means to reduce the extent or severity of injury from entanglement in the husking rolls? [Answer: 65%]

██

We conclude that this verdict structure (and the accompanying instructions) on the enhancement phase of Farrell's claim, viewed *in toto,* adequately conveyed a logical basis to allocate damages between the parties. Id. at 154, 370 N.W.2d at 820. We reach this conclusion because only Deere was alleged to have enhanced the injuries through its failure to provide an emergency shut-

off device. There was no evidence that Farrell or the other defendants in any way contributed to the design defect that enhanced Farrell's injuries. Finally, the special verdict asked the jury to bring the two parts of the verdict together by allocating the percentage of damages and injuries due to the entanglement and that due to the enhancement. Thus, the verdict and the jury instructions provided a logical basis to allocate the damages between the incidents and the parties. *Id.* at 154, 370 N.W.2d at 820, and there was no error.

## OTHER JURY INSTRUCTIONS

Deere claims two additional jury instruction errors: (1) the trial court failed to define "dangerous defect"; and (2) the instructions, in effect, directed the jury to find Deere responsible for Farrell's enhanced injuries. Because Deere's first claim of error is waived and the second one is without merit, we affirm.

First, Deere asserts that the instruction on burden of proof for enhanced injuries erroneously failed to include the "consumer contemplation" test for determining whether a design defect existed. To meet this test, the product "must contain a dangerous defect whose presence an ordinary consumer would not reasonably expect." *Arbet v. Gussarson,* 66 Wis. 2d 551, 557, 225 N.W.2d 431, 435 (1975). When given the opportunity to object to the instruction, Deere registered certain other objections which the trial court accommodated. Deere, however, did not object on the grounds now asserted on appeal. Nor did it request any more explicit language concerning the consumer contemplation test. Failure to object to an instruction or to request inclusion of another instruction constitutes waiver of the claimed

error. *In re C.E.W.,* 124 Wis. 2d 47, 54, 368 N.W.2d 47, 51 (1985); *Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 463, 405 N.W.2d 354, 381 (Ct. App. 1987).

Next, Deere argues that the following language in the enhanced injury instructions misled the jury and invaded its province.

> Plaintiffs further allege that the failure to provide an emergency stop device was a substantial factor in causing Gordon Farrell's injuries to be far greater than they would have been, had such a device been available. *The plaintiff can recover for these additional or more severe injuries under the "enhanced" injury theory.* [Emphasis added.]

Deere contends that this language virtually instructs the jury to find against Deere for Farrell's enhanced injuries. We disagree.

The particular language of a jury instruction is within the discretion of the trial court. *See McMahon v. Brown,* 125 Wis. 2d 351, 354, 371 N.W.2d 414, 416 (Ct. App. 1985). The instructions, however, must be framed with regard to the evidence and the applicable law. *Id.*

This instruction merely tells the jury that the law recognizes the theory of injury enhancement as a basis for recovery. This is a correct statement of the law. The instruction did not tell the jury that it must find for Farrell.

The jury was also instructed that:

> a manufacturer may not claim that it does not intend its products to be involved in an accident when it can easily foresee and when it knows that the probability of some type of injury-producing accident, involving agricultural equipment, is high.

██ Deere asserts that the jury was misled by this instruction and that the language was prejudicial and inflammatory. Here also, we disagree with Deere. Again, we view this language as merely advising the jury of basic products liability and negligence law. Intent as to the harm is not relevant to the trial of such claims. Viewing the jury instructions as a whole, we find no error.

## EXPERT TESTIMONY

At trial, Farrell called John Sevart as an expert witness. Sevart is a licensed professional engineer and is familiar with the operation of the cornhusker involved in the Farrell accident. Sevart's subspecialty is machine design with an additional emphasis on human factors related to machine design. Sevart testified that he had investigated several hundred accidents associated with farm machinery and had made a study of the risks associated with the husking box on a corn picker. He also testified about an emergency stop device he had designed which could have been installed near the husking rolls to reduce injuries in the event of entanglement in the rolls.

On Sevart's direct examination, the following exchange took place:

> Q. Let me ask it again. Do you have an opinion, a professtional [sic] opinion, Mr. Sevart, as to whether if the device which you have devised for the machine or a substantially similar device had been available on the day of Mr. Farrell's accident he would have the—the injuries resulting from that accident would have been more or less severe?
>
> A. Yes, I have an opinion.
>
> Q. And what is that, sir?

A. It would be my professional opinion that the injuries experienced by Mr. Farrell would have been significantly reduced.

Q. Are you able to identify the extent of reduction, sir?

A. Yes.

Q. Can you give us a little more information on it?

MR. CANNON: Object to lack of competency.

THE COURT: He may answer.

THE WITNESSES [sic]: Yes. I would expect at least an 80 percent lack of deduction [sic] in the over-all, total injuries experienced.

On appeal, Deere contends that Sevart was not qualified to testify as an expert in the field of injury apportionment, and thus the trial court erred when it permitted Sevart to opine that 80% of Farrell's injuries were "enhanced." Further, Deere notes that Sevart did not testify to a reasonable degree of probability that any injury would have been avoided by the emergency stop device.

The determination that a witness is qualified to testify as an expert and that his or her opinion should be admitted into evidence rests within the sound discretion of the trial court. *State v. Hamm,* 146 Wis. 2d 130, 142–43, 430 N.W.2d 584, 590 (Ct. App. 1988). On review, we will not reverse absent an abuse of discretion. *Id.* at 144, 430 N.W.2d at 591. We review a discretionary decision only to determine whether the trial court examined the facts of record, applied a proper legal standard and, using a rational process, reached a reasonable conclusion. *Id.* at 145, 430 N.W.2d at 591.

The basic test for determining the qualification of an expert is whether the expert's opinion, based on his or her experience and knowledge, will assist the jury in arriving at a conclusion. *Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 217, 216 N.W.2d 542, 546 (1974). Our examination of the record satisfies us that Sevart possessed sufficient experience and knowledge such that the trial court did not abuse its discretion in choosing to allow the testimony. As a mechanical engineer with a specialty in the area of machine design, Sevart had designed agricultural equipment and safety devices for this equipment. He also had performed a safety study on husking rolls in corn pickers. In addition, he had published on the subject. The trial court did not abuse its discretion in permitting Sevart to give opinion testimony that an emergency shut-off device could have reduced the severity of Farrell's injuries. The weight and credibility to be given to his testimony was for the jury to assess.[8]

We also conclude that Deere has waived its right to complain that Sevart did not testify to a "reasonable

---

[8]In opposition, Deere presented the testimony of an accident reconstructionist who opined that Farrell could not have activated an emergency stop device even if it had been installed on this particular corn-picker. Similarly, another of Deere's experts testified that he did not know if the severity of the injury is related to the length of time the individual is caught in the husking rolls.

Deere argues that this testimony shows that there was no basis for the jury's apportionment of enhanced injuries and damages. We disagree. It was the prerogative of the jury to reject the testimony of Deere's experts and accept Sevart's opinion that the lack of a stop device enhanced Farrell's injuries.

degree of probability" that any injuries would have been avoided with the installation of the stop device. Deere's objection went to Sevart's *competency*—not to the form of the question. An objection to evidence must apprise the trial court of the specific grounds upon which the objection is based in order to entitle the objector to appellate review. Sec. 901.03(1)(a), Stats.; *Holmes v. State,* 76 Wis. 2d 259, 271, 251 N.W.2d 56, 62 (1977).

## ADDITUR TO DAMAGES

Last, Deere claims that the trial court erred when it granted Farrell's additur motion. We, however, do not address Deere's claim of error on the merits because Deere forfeited its right to review of the additur decision by accepting the additur judgment rather than a new trial.

Following trial, the trial court ruled that the jury's damage award was too low and accordingly increased the award by $565,000. Additionally, the trial court properly offered Deere the option of either accepting the additur or choosing to receive a new trial limited to the two damage awards. *See Lambert v. Wrensch,* 135 Wis. 2d 105, 112, 399 N.W.2d 369, 372 (1987). Deere, in a letter to the court and opposing counsel, chose to accept the additur judgment with the caveat that it was not "waiving any appellate rights available under the law."

Additur and remittitur are governed by sec. 805.15(6), Stats. If a trial court determines that additur is appropriate, it must order a new trial on the issue of damages, unless within ten days the defendant opts to accept the judgment in the increased amount. Sec. 805.15(6); *see also Lambert,* 135 Wis. 2d at 112, 399 N.W.2d at 372. If the defendant does not accept the

additur judgment, and a new trial is ordered on damages, the defendant may petition the court of appeals for leave to appeal the order for a new trial. Sec. 805.15(6).

In the converse situation—remittitur—our supreme court has held that a plaintiff who accepts the reduced award is precluded from seeking review of the trial court's determination of the damages. *Burmek v. Miller Brewing Co.,* 12 Wis. 2d 405, 417, 107 N.W.2d 583, 589 (1961). A litigant cannot seek a review of what he has accepted. *Id.* This rule was later relaxed, but only to the extent of allowing cross-appeal of a remittitur damage award when the other party initiates the appeal. *Plesko v. City of Milwaukee,* 19 Wis. 2d 210, 220, 120 N.W.2d 130, 135 (1963).

Deere argues that the *Burmek* rationale is inapplicable to defendants who have accepted additur. In support, Deere cites to the *Plesko* language that plaintiffs often accept remittitur in order to avoid an appeal. *Id.* at 221, 120 N.W.2d at 135. Deere argues that the same is not true for defendants who accept additur because they may still have compelling motives to appeal on other grounds (i.e., liability or causation). While this may be more often true with respect to defendants who accept additur, we cannot say that *all* plaintiffs who have accepted remittitur will not desire review on other grounds. *Plesko* does not state that such a plaintiff will never wish review. Rather, *Plesko* only says that "[i]n most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal." *Id.*

Thus, we do not agree with Deere that the *Plesko* rationale means that *Burmek* cannot apply to an additur situation. To the contrary, *Plesko* leaves the basic thrust

of *Burmek* intact—appellate review of what one has accepted is not permitted. The *Plesko* rationale was offered only as justification for relaxing the rule against review in cross-appeal situations—not for limiting *Burmek*'s application only to remittitur situations. Like the plaintiff in *Burmek,* Deere has accepted the modified damage award. It cannot now appeal it.

Deere also argues that the *Burmek* waiver rule should not be extended to additur cases because it would be unfair to create a rule whereby a party suffering additur can never appeal the increased award. This is not entirely correct. A defendant may petition for leave to appeal an additur judgment if it does not accept the increased award and a new trial on the issue of damages is therefore ordered. Sec. 805.15(6), Stats.

## CROSS-APPEAL

Farrell cross-appeals, requesting a new trial as to his claims against Navistar, contending that various trial court errors resulted in the jury improperly apportioning 70% of the causal negligence to him and only 20% to Navistar. We reject these claims.

## EVIDENTIARY RULING, JURY INSTRUCTIONS AND SPECIAL VERDICT

Farrell argues that the trial court erroneously excluded evidence of other similar accidents, gave incomplete contributory negligence jury instructions and improperly allowed the jury to assess Mueller's negligence in the special verdict. Farrell argues that the cumulative effect of these errors was to unfairly minimize Navistar's conduct and to prejudicially emphasize his own contribution to the accident.

The basis of Farrell's claim against Navistar was that the PTO device on the tractor was defective. Farrell testified that he left the tractor engine running when he went back to inspect the husker. However, he could not remember whether he disengaged the PTO, although it was his practice to do so. Farrell's theory was that the disengaged PTO spontaneously reengaged, causing the picker to start up again, while Farrell was inspecting the husking rolls.

Prior to trial, Farrell gave notice that he intended to submit evidence of eight other accidents in which an injured party claimed that a PTO on a tractor manufactured by Navistar had spontaneously reengaged, causing injury. Farrell sought to use this evidence to show that Navistar knew of the danger presented by the faulty PTO. Navistar moved *in limine* to exclude this evidence.

At the motion hearing, the trial court ruled that Farrell could use the "other accidents" evidence, subject to an adequate showing at trial of sufficient similarity to the facts in Farrell's case.

This issue resurfaced on the sixth day of trial when one of Farrell's expert witnesses, Frederick Elder, was testifying. Elder was prepared to testify about one of the "other accidents," the "Townley" incident. Navistar objected and a protracted hearing outside the jury's presence was conducted. This hearing addressed not only the "Townley" incident but also the other incidents. During this hearing, Farrell presented the court with Exhibit 469, a 231-page "summary" in support of Farrell's claim that the "other accidents" evidence was admissible.

This "summary" referenced: (1) various answers to interrogatories, (2) Navistar service manuals, (3) deposition testimony purporting to show sufficient similarity between the PTO system on the "other accident" tractors and that in Farrell's case, (4) deposition testimony

from Farrell's experts purporting to show sufficient similarity as to how the "other accidents" occurred compared to the Farrell accident, (5) Navistar operator's manuals for various of its tractors, and (6) Navistar's responses to certain of Farrell's requests for admission. After the trial court ruled against Farrell on this issue, this "summary," together with the discovery data upon which it was based, were submitted as an offer of proof.

Evidence of other accidents may be admissible in a products liability case to show the probability of the defect in question, that the injury was caused by the defect and that the person responsible for the defect knew or should have known of its existence. *Lobermeier v. General Tel. Co.,* 119 Wis. 2d 129, 150, 349 N.W.2d 466, 476 (1984). The admissibility of prior accidents is discretionary with the trial court. *Id.* The evidence may only be admitted where the accidents occurred under conditions and circumstances similar to those of the accident which injured the plaintiff. *Id.* When the prior accidents are of little probative value, the trial court in its discretion may refuse to admit such evidence. *Id.* at 150–51, 349 N.W.2d at 476. When reviewing evidentiary issues, the question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record. *State v. Stinson,* 134 Wis. 2d 224, 232, 397 N.W.2d 136, 139 (Ct. App. 1986).

The trial court rejected the evidence, ultimately concluding that the risk of juror confusion and possible juror misuse of the evidence was too likely. We acknowledge that certain of the court's other remarks in the course of the protracted hearing on this question sug-

gested that the court believed that the evidence could not be used, as a matter of law, to establish a defect or causation.[9] Upon this, Farrell hinges his argument.

Viewed *in toto,* however, we do not conclude that any such misapprehension about the law in this area underpinned the trial court's reasoning. When the "other accidents" issue was first addressed prior to trial at the motion *in limine,* the trial court clearly recognized the potential relevance of such evidence, for the court conditionally ruled the evidence admissible, subject to the requisite showing at trial that the "other accidents" were sufficiently similar to the Farrell case. When the court ultimately made its ruling at trial, it coupled its conclusion that the evidence was inadmissible to prove "that this accident occurred or this PTO malfunctioned" with the later observation that:

> Having worked with many jurys [sic] over many years, I cannot see a jury separating that out as a separate issue. They're human. They don't do that. They will just use that as accumulative evidence, saying that it's happened seven times before therefore it

---

[9]The trial court stated, in part, when ruling on the evidentiary question:

Well, the Court reviewed the situation and as far as the Court is concerned I, number one, agree whole-heartedly with the Defendant. The Court does not believe that this testimony of other occurrences can be used in any way to prove that this occurrence occurred. But then I agree with the Plaintiff that he has every right to put in all those episodes for the issue of his punitive damages. Not to prove that this accident occurred or this PTO malfunctioned, I don't think he can use any part of it to show that this one malfunctioned. But on the issue of punitive damages he would have the right to put in all the previous episodes that were known to Navistar. Now, the only way that I could see that really being done is to bifurcate the trial and the damages away from the rest of it, the punitive damage issue away from the rest of it.

happened in this case, *whether you've proven this case or not.* [Emphasis added.]

The totality of the trial court's remarks, viewed in the context of the entire case, satisfies us that the trial court was not operating under a mistaken view of the law as to the admissibility of this evidentiary question. To the contrary, our view of the entire record on this question reveals an exercise of trial court discretion which balanced the relevance of the evidence against the risk of undue prejudice. *See* sec. 904.03, Stats. The court concluded that the risk of juror misuse of the evidence and juror confusion about the evidence outweighed its probative value. This court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination and the basis for that exercise of discretion is reflected in the record. *Stinson,* 134 Wis. 2d at 232–33, 397 N.W.2d at 139. These considerations are satisfied by the court's ruling on this issue.

We also affirm the trial court's ruling on an alternative ground not expressly addressed by the court. We may independently search the record to determine whether it provides a basis for the trial court's unexpressed exercise of discretion. *Schinner v. Schinner,* 143 Wis. 2d 81, 104, 420 N.W.2d 381, 390 (Ct. App. 1988). Except for the "Townley" incident (which found its way into evidence in any event), we conclude Farrell's offer of proof regarding the "other accidents" did not satisfy the "sufficient similarity" requirements of the law. *See Lobermeier,* 119 Wis. 2d at 150, 349 N.W.2d at 476.

Here again we have examined the record made on the offer of proof in detail. In his deposition, John Sevart, one of Farrell's experts, related his investigations of the "other accidents" involving victims Steele, Purol

and Weekly.[10]

As to Steele, Sevart could not recall whether the evidence showed that the PTO had been disengaged before the accident. All Sevart could recall was that Steele reported that "[e]verything was stopped and there was no sound coming from the baler."

As to Purol, Sevart at one point testified that the implement was not running when Purol approached the machine. However, Sevart also testified that another person thought he might have inadvertently hit the control lever causing the machine to start up.

As to Weekly, Sevart testified that the implement was not running when Weekly approached it, but later stated that he could not recall what the evidence indicated as to the lever position when Weekly left the tractor. Sevart had not spoken directly with Weekly, but stated he had been told that the power had been disengaged.

The uncertainty of Sevart's testimony regarding the status of the PTO in each of these other incidents leaves the threshold requirement of sufficient similarity in a similar state of uncertainty. Given the clear risk for potential misuse of such testimony (a sentiment expressed by the trial court), the law has wisely chosen to restrict its permitted use to circumstances where sufficient similarity has been established. Farrell's offer of proof as to the Steele, Weekly and Purol incidents leaves this requirement unsatisfied.[11]

---

[10]Sevart also testified at his deposition that he had investigated the "Cross" incident. However, the "summary" of the offer of proof does not relate any of Sevart's deposition testimony concerning this incident.

[11]Given the uncertainty of Sevart's recollections as to the factual backdrop of these other incidents, we do not deem his

We turn next to Farrell's argument that the jury instructions misstated the legal duties owed by the respective parties in this case. The particular language of a jury instruction is within the discretion of the trial court. *See McMahon,* 125 Wis. 2d at 354, 371 N.W.2d at 416.

The instructions, however, must be framed with regard to the evidence and the applicable law. *Id.*

Farrell argues that two of the instructions on contributory negligence overemphasized his obligation in the presence of a "known risk." The disputed instructions read as follows:

> The user of a product may be contributorily negligent if he voluntary [sic] exposes himself to a known danger. If you find that the user, Gordon Farrell, used the product . . . knowing that the tractor and/or the corn-picker had been maintained in such a manner as to render them unsafe or that Gordon Farrell failed to follow the directions and the warnings as to the use of the tractor and/or corn-picker, then you'll find Gordon Farrell negligent.
>
> . . ..
>
> There has been evidence in this case suggesting that a risk of bodily injury is present when one works on or around power driven farm implements. Well, [sic] the engine on the tractor supplying the power to the

opinion that the PTO's were disengaged in each of these circumstances sufficient to satisfy the "similarity" requirements of the law.

Although Farrell originally indicated that he intended to introduce evidence of eight "other accidents," the offer of proof reveals only four (Townley, Steele, Weekly, and Purol) about which any indicated witness was prepared to testify.

engine is running. If you so find and if you find that Gordon Farrell knew or should have known of such risk and if you find that Gordon Farrell's exposure of himself to this risk was not consistent with the exercise of ordinary care for his own safety, then you will find Gordon Farrell contributorily negligence [sic].

■■■

Other than registering the argument against these instructions, Farrell does not further explain how they overstate the user's obligation in the presence of a known risk. Nor does Farrell cite us any law in support of his contention. We conclude that the language selected by the trial court was appropriately tailored to the facts of this case and accurately stated the law. No abuse of discretion occurred. *See id.*

Farrell next argues that the trial court erred by failing to give the standard jury instruction on the duty of a buyer or consumer to use a product in accordance with instructions which are adequate. *See* Wis J I—Civil 3254.[12] Farrell contends that this jury instruction was

---

[12]Wisconsin J I—Civil 3254 reads as follows:

DUTY OF BUYER OR CONSUMER

The buyer (consumer) has a duty to use ordinary care for his own safety and protection, and, to that end, to observe all obvious and patent defects and dangerous conditions, if any, which are open and obvious to him if he is using reasonable care and caution for his own safety and protection. The danger, however, must not only be obvious, but also must be understood by the buyer (consumer). The failure to use a product in accordance with the instructions which are adequate, if you find they were adequate, or the use of such product in an abnormal manner is negligence.

A person is not bound absolutely by law to see every defect or dangerous condition, or even to remember the existence of every defect or dangerous condition of which he had knowledge. He is only required to act as a reasonably prudent person under the same or similar circumstances would act.

A person is not required to anticipate negligent acts or omissions on the part of others, and is not guilty of contributory negligence in

warranted because the evidence showed that the PTO mechanism was a complicated device and because he was never adequately advised of the risk of working on or near the attached corn picker without first shutting off the tractor engine.

As to the latter point, the evidence is to the contrary, showing that Farrell had been warned of the risks associated with the PTO through his reading of manuals, his personal experience with this tractor and Mueller's prior admonitions to turn off the tractor before working on or near the picker. As to the former point, although the PTO may be a complicated device from an engineering and mechanical standpoint, its actual operation by a user is not a complicated activity. We conclude that the trial court did not abuse its discretion in refusing to instruct the jury on the duty of a buyer or consumer.[13]

A challenge to the jury instructions upon appeal requires us to consider the instructions as a whole and in their entirety. *Leahy v. Kenosha Memorial Hosp.,* 118 Wis. 2d 441, 451, 348 N.W.2d 607, 613 (Ct. App. 1984). If this analysis leads to the conclusion that the overall meaning communicated by the instructions was a correct statement of the law, no grounds for reversal exist. *Id.* In addition, we must be satisfied that a probability, and not a mere possibility, existed that the jury was misled. *Id.* at

---

failing to look out for danger when there is no reason to suspect any such danger.

[13]Because we conclude that the instruction was not warranted by the evidence, we need not discuss Farrell's further claim that the jury should have been told, pursuant to this instruction, that it must first find that the safety instructions were adequate before it could find Farrell contributorily negligent for failing to follow the safety instructions.

451–52, 348 N.W.2d at 613. Here, viewing the instructions *in toto,* and particularly noting that the jury was otherwise correctly instructed as to Farrell's contributory negligence, we conclude that no reversible error occurred.

Farrell next challenges the inclusion of Mueller's alleged negligence on the special verdict. Prior to trial, the trial court had ruled that Farrell was a trespasser as to Mueller's corn picker because Mueller had told Farrell not to use the corn picker. Neither party challenges this determination. An individual who uses personal property without the owner's permission is a trespasser as to the owner of the property. *See Hartman v. Badger Tobacco Co.,* 210 Wis. 519, 520, 246 N.W. 577, 578 (1933). Since Farrell was a trespasser, Mueller did not owe him a duty of ordinary care. Mueller's only duty was to refrain from willful and intentional injury. *Antoniewicz v. Reszczynski,* 70 Wis. 2d 836, 842, 236 N.W.2d 1, 4 (1975). Thus, Mueller could not have been found causally negligent for the accident as a matter of law. Inclusion of Mueller's negligence in the special verdict was therefore error.

Farrell argues that the error was prejudicial because it improperly gave Navistar the opportunity to emphasize its contention that the "problem" with the PTO had to do with Mueller's lack of maintenance, thereby shifting the jury's attention away from Navistar's PTO design.

We conclude the error was harmless. Excluding Mueller from the special verdict would not have rendered the evidence concerning Mueller's participation in this incident inadmissible. Indeed, Farrell does not contend that the jury would have heard any different evidence

regarding his own and Navistar's negligence if Mueller's negligence had not been included in the special verdict.

Although the inner workings of the jury room are not known to us, a close analysis of the verdict in light of the claims and evidence leads to certain obvious conclusions about the jury's reasoning. Farrell claimed that Navistar was negligent in its design and manufacture of a PTO which would spontaneously reengage. The jury obviously agreed since it found Navistar causally negligent. Implicit in this finding is the jury's further acceptance that Farrell left the tractor running when he went back to inspect the corn picker. This is because the PTO could not have reengaged if Farrell had shut the tractor off. Whether the malfunction of the PTO was assessed on the basis of Navistar's negligence or Mueller's negligence (or both), this would not impact upon the jury's assessment of Farrell's contributory negligence in inspecting the corn picker with the tractor running. Under either scenario, the PTO device spontaneously reengaged.

At most, the only effect of eliminating Mueller from the special verdict could be to increase Navistar's negligence by the 5% assigned to Mueller. We are satisfied that the jury's assessment of Farrell's contributory negligence would not have been different had Mueller's negligence not been included in the special verdict.

## MISAPPORTIONMENT OF CAUSAL NEGLIGENCE

Farrell argues that the jury's apportionment of 70% causal negligence to him in the entanglement portion of the verdict was grossly disproportionate and contrary to the evidence, therefore warranting a new trial. He reasons that the jury could not have found Navistar merely

20% negligent unless it had found that the PTO malfunctioned after Farrell had disengaged it. Farrell argues that under this view of the facts there is no legal basis for finding him 70% causally negligent. We disagree.

The apportionment of negligence is a question for the jury, and the apportionment must be sustained if there is any credible evidence to support it. *Stewart v. Wulf,* 85 Wis. 2d 461, 471, 271 N.W.2d 79, 84 (1978). Further, this court will give great weight to a jury apportionment of negligence when the trial court has reviewed that apportionment and given reasons for sustaining it. *Id.* at 474, 271 N.W.2d at 85.

When ruling on motions after verdict, the trial court reviewed the jury's apportionment of negligence and gave reasons for sustaining it.

> Was Gordie Farrell negligent. And they said yes, and they said it was a cause of the accident. And I think most everybody—the testimony was real overwhelming that Gordie's big negligence in this matter was the failure to turn off the tractor. And the jury obviously hung the greatest weight on that one failure and said that one item was the greatest cause of this whole entanglement. That if Gordie had turned off that tractor before going back to this machine or before trying to do anything with the machine at all, the other malfunctions or poor designs or poor designs [sic] would have meant nothing, the accident would not have happened. So the Court believes that the apportionment of the negligence—although it may not be in the same percentage that this Court would have apportioned—the jury had a grounds to apportion at that basis. They had a right to believe that Gordie's failure to turn off that tractor was the overwhelming one cause of this accident. So as far as

the percentages are concerned, the Court will not consider disturbing them.

Accepting that Farrell disengaged the PTO, one reasonable version of the evidence reveals that Farrell's failure to turn off the tractor was contrary to warnings given him by Mueller, in the manuals and on the tractor itself. Additionally, there was evidence that Farrell on other occasions had turned off the tractor because he had experienced situations in which the PTO would not disengage.

Evaluating the evidence in a light most favorable to the jury verdict, and considering the reasons the trial court gave for sustaining the apportionment, we conclude that the jury's apportionment is not grossly disproportionate. Nor is it contrary to the evidence. Accordingly, we affirm.

## INTEREST OF JUSTICE

Last, Farrell contends that he is entitled to a new trial in the interest of justice. He argues that when the cumulative effect of the trial court's errors is considered in light of the grossly disproportionate apportionment of negligence, it is apparent that there has been a miscarriage of justice with respect to his claims against Navistar.

We are authorized to grant a new trial in the interest of justice if we are convinced that a miscarriage of justice has occurred. *Thompson v. Howe,* 77 Wis. 2d 441, 452, 253 N.W.2d 59, 64 (1977); sec. 752.35, Stats. However, this court ought not grant a new trial unless we are convinced to a reasonable certitude that if there were a new trial it would probably effect a different result.

*Heldt v. Nicholson Mfg. Co.,* 72 Wis. 2d 110, 119, 240 N.W.2d 154, 159 (1976). There was no reversible error in the trial of this case. We are not satisfied that a new trial would probably produce a different result.

*By the Court.*—Judgment affirmed.